| | |
|---|---|
| **JAMES C. WEIDE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 1:07 CV 328** |
| ) | |
| **SWISS RE LIFE & HEALTH** ) | |
| **AMERICA, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION and ORDER

### I.    INTRODUCTION

Before the court is defendant's motion for summary judgment. (DE # 29.) For the reasons set forth below, the motion is denied as to plaintiff's Age Discrimination in Employment Act ("ADEA") claim, and granted as to plaintiff's Employment Retirement Income Security Act ("ERISA") claim.

### II.    BACKGROUND

Unless otherwise designated, the following facts are not in dispute. Plaintiff James Weide is a 58-year-old man who developed a business and finance background into a career in the insurance industry. In 1990, plaintiff was hired by Lincoln National Insurance, which was later known as Lincoln Re, as Director of Special Risks Marketing. In 2001, defendant Swiss Re Life and Health purchased Lincoln Re, and Weide's position was eliminated in 2002 as a result. A few months later, defendant rehired plaintiff as its Second Vice President of Market Research at the age of 49. Weide's

responsibilities included creating client profiles, developing presentations for the sales staff, drafting speeches for top-level executives, tracking changes in the term insurance market, market research analysis, risk management analysis, creating monthly reports on clients and industry news, and managing a client information database.

In 2005, defendant reorganized into three new divisions, one of which was entitled Client Markets. Donna Kinnaird, a 54-year-old[1] woman who was named head of Client Markets, created a team called the Research, Analysis, and Execution team ("RAE"), the purpose of which was to support the sales staff and marketing efforts of client-facing members. Plaintiff was assigned to the RAE team, along with his immediate supervisor, 45-year-old Daniel Flahive, and two other co-workers, Theresa Trauner and Becky Kroll. Flahive began supervising plaintiff in September 2005. Plaintiff expressed discontent about Flahive's leadership and demands, as well as some aspects of his own new role.

Flahive authored plaintiff's 2005 annual review. Flahive criticized plaintiff's lack of leadership, unprofessional communications, poor performance, and lack of technical skills. Flahive's overall assessment was that plaintiff was performing at a "Basic Contribution" level. Plaintiff received a merit salary increase of 2.5%. In February 2006, plaintiff informed Kroll that she was going to be terminated, which was counter to the plan that executives and defendant's human resources consultant, Christine Juechter,

---

[1] Unless otherwise designated, ages are provided as of 2006, the year of plaintiff's termination.

had previously developed. In March 2006, plaintiff received a verbal warning for forwarding an email to another co-worker for which the email was not intended.

In June 2006, defendant acquired another company called GEIS. After doing so, defendant instituted a corporate reorganization. Defendant asserts that it asked its Client Markets division to evaluate whether it was made up of the appropriate level of staff possessing the appropriate skill sets to meet business objectives. Defendant further asserts that Client Markets was asked to reduce its headcount by one. Kinnaird and Flahive performed this analysis for the RAE team. Defendant asserts that Kinnaird and Flahive determined that plaintiff's position could be eliminated and his duties absorbed by other employees at the company.

According to Kinnaird and Flahive, the RAE unit also needed personnel possessing knowledge about pricing and financial metrics, and proficiency with financial data including the ability to make recommendations based on a keen understanding of insurance products, and a higher level of expertise in producing reports and other data with tools such as Excel, Access, and PowerPoint. By eliminating plaintiff's position, Kinnaird and Flahive reasoned, the company could create a new position to bring more of these technical skills to the forefront. Defendant created computer files containing job descriptions for the new position; the filepath for these files contained the name of 31-year-old Heather Majewski, who at that time worked at the company as a pricing actuary.

Prior to plaintiff's termination, Juechter met with Flahive to discuss the details of the decision and took handwritten notes. Juechter's notes included the following:

> Notes from discussion w/ Dan Flahive on Weide term.
>
> Technical:
>
> - Understand financial aspects of business.
> - Need an actuarial / financial background to help Donna understand the business
> - Heather Majewski ~~will~~ may replace.

(Pl.'s Resp. Tab 5 at 82.) Juechter testified in her deposition that she crossed out "will" and wrote "may" during the meeting, and did so because "I misunderstood in the conversation the intent regarding Heather Majewski, and I then changed it from will to may." (Pl.'s Resp. Tab 5 at 51-52, Juechter Dep. 224-25.)

Defendant terminated plaintiff in July 2006 via Juechter, who informed plaintiff that his termination was not merit-based and that he was minimally meeting expectations, but that the company had eliminated his position. Plaintiff was 54 years old at the time. Juechter's notes indicated that plaintiff was very emotional during the meeting and that he asked if he could stay with the company until he reached age 55 so he would be eligible for retirement benefits and so he could retire "with dignity." Plaintiff was informed that this was not possible. Kinnaird and Flahive attest that they were not aware of plaintiff's ineligibility for retirement benefits when they decided to terminate him.

After plaintiff's termination, defendant appointed Majewski to the position of "Vice President - Marketing and Sales." The company assigned 35-year-old actuarial sciences associate Jeremy Lane into Majewski's former position. The company did not replace Lane. According to defendant, this accomplished the company's objective of reducing the Client Market division's overall headcount by one. Four days after plaintiff's termination, Flahive emailed the Client Markets division welcoming Majewski to her new position. The email extolled Majewski's "energetic and outgoing personality" and indicated that Majewski would bring "new perspectives to this role." The email listed five of Majewski's "[s]pecific responsibilities"; plaintiff asserts that all of these duties previously belonged to him. Another employee, Cheryl Bultemeier, contacted plaintiff after reading Flahive's email, stating: "I thought they eliminated your job." (Pl.'s Resp. Tab 2, Weide Dep. 368.)

Plaintiff disputes defendant's rationale for his termination and its assertion that Majewski was placed into a new position; instead, plaintiff argues that defendant fired him on the basis of age and that Majewski took over his former position, only with a different title. Trauner believed that Majewski had replaced plaintiff. Majewski testified that, during her discussion with Flahive about her new role, she inquired whether "it was Jim Weide's role. Because some of it sounded familiar. And his answer was no." (Pl.'s Resp. Tab 7, Majewski Dep. 50.)

The parties do not dispute that the majority of plaintiff's former duties were absorbed by Majewski, that some were absorbed by another employee named Jason

Render, and that numerous other employees—both above and below age 40—took over the remainder. In Majewski's December 2006 self-assessment, Majewski listed four goals, out of nine, that were virtually identical to plaintiff's goals of May 2006. Majewski's duties in her new position included responsibilities which were not previously assigned to plaintiff, such as duties relating to a project called the Hartford Longevity Project, supporting defendant's Business Transformation Initiative, analyzing and prioritizing clients from both property/casualty and life/health standpoints, working with defendant's economic research arm on a "share of the wallet" analysis, developing guidelines for the client visit process, and serving as defendant's health executive project team manager.

## III.   LEGAL STANDARD

The FEDERAL RULES OF CIVIL PROCEDURE mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). RULE 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must

prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995); *Doe,* 42 F.3d at 443.

## IV. DISCUSSION

Defendant has moved for summary judgment on plaintiff's claim that defendant fired him because of his age in violation of the ADEA. A plaintiff defending against a defendant's motion for summary judgment on an age discrimination claim may rely on direct and/or indirect methods of proof. *See Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 641 (7th Cir. 2008). Under the direct method, a plaintiff must offer evidence that "points directly" to a discriminatory reason for the employer's action. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008). The indirect, or "burden-shifting," method allows a plaintiff to avoid summary judgment with proof that falls short of directly pointing to a discriminatory motivation if it can survive a three-phase analysis. It is with this latter test that the court begins its discussion.

In the first phase of the burden-shifting analysis, the plaintiff must establish a prima facie case of discrimination. Establishing the prima facie case should not be an onerous requirement. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). "The plaintiff's evidence on the prima facie case need not be overwhelming or even destined to prevail; rather, the plaintiff need present only some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion." *Id.* (quoting *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000)) (internal quotation marks omitted). Once a plaintiff has done so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the employer does so, then the burden shifts back to the plaintiff for the third and final phase of the indirect method, during which plaintiff must offer evidence suggesting that the proffered explanation is a pretext for discrimination. *Id.*

In order to establish a prima facie case of discrimination, a plaintiff must satisfy four elements. The first three of these elements are: 1) membership in a protected class; 2) job performance meeting the employer's legitimate expectations; and 3) an adverse employment action. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007). The parties do not dispute that plaintiff was aged 40 years or older, and therefore a member of the protected class. Nor do the parties dispute that plaintiff's termination constituted an adverse employment action.

However, the parties do disagree about whether plaintiff was meeting defendant's legitimate expectations. The court agrees with plaintiff on this point. Defendant points to plaintiff's 2005 annual review, authored by Flahive, which criticizes plaintiff's lack of leadership, unprofessional communications, poor performance, and lack of technical skills. On the other hand, as plaintiff points out, Flahive had only supervised plaintiff for a few months before conducting his review and Flahive's overall assessment was that plaintiff was performing at a "Basic Contribution" level. Plaintiff also received a merit salary increase of 2.5%, and had received merit increases the preceding three years as well. Defendant also argues that plaintiff received a verbal warning in March of 2006 for forwarding an email to an unintended recipient and, in so doing, undermining the effectiveness of the company's team dynamic. Nonetheless, plaintiff was informed during his termination meeting that his termination was not performance-related.

Viewing the evidence in a light most favorable to plaintiff, and considering the low burden carried by a plaintiff at the prima facie stage, the court finds that plaintiff has presented sufficient evidence to show that he was meeting his employer's legitimate expectations. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 692 (7th Cir. 2006) (fact that evaluation contained mixed reviews, contained criticisms as well as compliments, and was "at best, inconclusive" and fact that plaintiff received merit-based pay raise indicated plaintiff was meeting expectations for purposes of meeting prima facie requirement).

Having addressed the first three elements of the prima facie case, the court now turns to the fourth. The Seventh Circuit has adjusted the fourth element depending on factual circumstances of a given case. In a termination case, the fourth element of the plaintiff's prima facie case is that the employer sought someone else to perform the same work. *Pantoja*, 495 F.3d at 846. However, defendant argues that this case involves a "mini-RIF" (reduction in force). A plaintiff's termination is classified as a mini-RIF "where an employer terminated an employee and then, instead of refilling her position, allowed other workers to absorb the fired employee's duties." *Simpson v. Office of Chief Judge of Circuit Court of Will County,* 559 F.3d 706, 718 (7th Cir. 2009).[2] In order to satisfy the fourth element of his prima facie case in a mini-RIF scenario, a plaintiff must show that his job duties were absorbed by existing employees not in the protected class (in this case, age 40 or over). *Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 725 (7th Cir. 2008). Plaintiff admits that this case could be classified as a mini-RIF case, but argues that it *also* could be classified as a traditional termination case subject to the fourth element as expressed in *Pantoja;* presumably the latter argument is based in plaintiff's belief that Majewski effectively took over his former position.

---

[2] The mini-RIF analysis is an alteration of the analysis applicable in the case of a traditional RIF, which "occurs when an employer permanently eliminates certain positions from its workforce," *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 693 (7th Cir. 2000). "[T]he determinative factor in deciding whether the mini-RIF variation applies is whether the discharged employee's duties were absorbed by an existing employee [in the case of a mini-RIF] or eliminated [in the case of a traditional RIF]." *Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 725 (7th Cir. 2008). The parties appear to agree that, if this case involves any type of RIF, it involves a mini-RIF.

If the court construed this case like a mini-RIF as defendant advocates, plaintiff must show that his job duties were absorbed by existing employees not in the protected class. Plaintiff has pointed to evidence indicating that Majewski and Render, both under the age of 40 at the time, absorbed most of plaintiff's responsibilities, but defendant has also pointed to evidence that some employees above the age of 40 also absorbed some of plaintiff's duties. The Seventh Circuit has issued inconsistent opinions on whether the fourth element of a plaintiff's prima facie case is met in a mini-RIF case when the plaintiff's duties are absorbed by multiple employees, some inside of and some outside of the protected class. *Compare Merillat,* 470 F.3d at 692 (fourth element met where "good deal" of plaintiff's duties absorbed by employees outside protected group); *with Petts,* 534 F.3d at 726 (sex discrimination plaintiff could not establish the fourth element because "[e]ven if some of her duties were absorbed by male employees, as she claims, some of them were absorbed by women").

This court would likely side with *Merrilat* and find that a plaintiff is not prevented from establishing the fourth element of his prima facie case merely because *some* of a plaintiff's duties are absorbed by *some*one inside the protected class. After all, if that were the case, employers could easily assign one relatively insignificant task to an existing employee who is a member of the protected class and thereby thwart any attempt a plaintiff might later make to establish a prima facie case under the burden-shifting framework. Thus, to apply *Pett's* holding on this issue would seem no more than a rigid application of the prima facie requirement of the burden-shifting test,

which appears incongruous with the Supreme Court's view of the test. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic"); *Teamsters v. United States*, 431 U.S. 324, 358 (1977) (Court "did not purport to create an inflexible formulation" for a prima facie case). Further, the Seventh Circuit's statement on this point in *Petts* is arguably dicta, as the court actually went on to apply a different fourth-element test given the facts of that case. *Petts*, 534 F.3d at 726. Assuming the court applied *Merrilat*, the court would find that the plaintiff could meet *Merrilat's* mandate, since both sides agree that Majewski took on most of plaintiff's former duties.

But even if the court applied the other fourth-element test advocated by plaintiff, which would require plaintiff to show that defendant sought someone else to perform the same work he used to perform, the court would come to the same conclusion and find that plaintiff had met his burden. *Pantoja*, 495 F.3d at 846. The facts of this case (taken in a light most favorable to plaintiff) suggest that defendant sought and acquired Majewski to perform the vast majority of plaintiff's former duties after his termination, and that it sought other employees to perform the remainder. Thus, regardless of which test the court chooses to represent the fourth element of the prima facie case, the court finds that plaintiff has fulfilled it, and in doing so has met his burden under the first phase of the burden-shifting analysis.

By establishing his prima facie case, plaintiff has created a rebuttable presumption of discrimination, which triggers the second phase of the burden-shifting analysis. *Cianci v. Pettibone Corp.,* 152 F.3d 723, 726 (7th Cir. 1998). At this point, the defendant must articulate a legitimate, non-discriminatory reason for plaintiff's termination. *Id.* This is a "light burden," *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir. 2010), which is "not difficult to satisfy." *Hague v. Thompson Distrib. Co.,* 436 F.3d 816, 826 (7th Cir. 2006). "An employer need only articulate lawful reasons for the action; that is, . . . the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (internal quotation marks omitted).

According to defendant, it instituted a corporate reorganization after the GEIS acquisition and that as part of this process, Client Markets was asked to evaluate whether it was made up of the appropriate level of staff possessing the appropriate skill sets to meet business objectives; Client Markets was also asked to reduce its headcount by one. Defendant has set forth evidence showing that Kinnaird and Flahive determined that plaintiff's position could be eliminated and his duties absorbed by other employees at the company. Kinnaird and Flahive also decided that the RAE unit needed more technical skills in its arsenal– skills exceeding those possessed by plaintiff. Defendant claims that it accomplished this by placing Majewski into a new position called Vice President - Marketing and Sales and moving Lane into Majewski's former

position without replacing him, thus reducing the Client Market department's overall headcount by one.

The Seventh Circuit has held that an employer's statement that a plaintiff's "position was eliminated as part of a company restructuring and that it selected someone else for a new position because that person was better qualified" constitutes a legitimate non-discriminatory reason satisfying the second phase of the burden-shifting test. *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 838 (7th Cir. 2009). The Seventh Circuit has also held that an employer's statement that it chose to terminate a plaintiff and retain another employee who possessed the company's desired skill set qualifies as an articulation of a legitimate non-discriminatory rationale. *Merrilat,* 470 F.3d at 693. Further, an employer's statement that it singled out the plaintiff's position as the one to terminate because it felt that plaintiff's duties could be absorbed by other employees has been accepted as satisfying the second phase of the burden-shifting analysis. *Davenport v. Northrop Grumman Systs. Corp.,* 281 Fed. Appx. 585, 588 (7th Cir. 2008). Thus, defendant has sufficiently articulated a legitimate non-discriminatory reason for plaintiff's termination, concluding the second phase of the burden-shifting analysis.

In the third and final phase of the burden-shifting analysis, the inference of discrimination that the plaintiff earned by establishing his prima facie case falls away. *Stockwell,* 597 F.3d at 901. At this point, plaintiff may avoid summary judgment only if he can produce sufficient evidence showing that the defendant's purported reason for its employment decision is pretextual. *Id.*; *LaFary v. Rogers Group, Inc.,* 591 F.3d 903, 907

(7th Cir. 2010). A pretext is a "deliberate falsehood." *Ptasznik,* 464 F.3d at 696. A plaintiff may demonstrate pretext directly by showing that a discriminatory reason more likely motivated his termination, or indirectly by showing that the employer's explanations are unworthy of credence. *Senske v. Sybase, Inc.,* 588 F.3d 501, 507 (7th Cir. 2009). In this case, plaintiff has attempted to show pretext indirectly by challenging the credibility of defendant's explanation. To show that an employer's explanations are not credible, a plaintiff must point to evidence that the reasons given are not the real reasons the employer acted, have no grounding in fact, or are insufficient to warrant the decision made. *Id.* The focus of the pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Ptasznik,* 464 F.3d at 696.

The Seventh Circuit has decided two cases in particular that warrant discussion. Surprisingly, neither case has been cited by either party regarding pretext. Both cases involved a plaintiff attempting to fend off a defendant's motion for summary judgment via the indirect method of proof, and in both cases the plaintiff argued that the defendant's stated reason for the plaintiff's termination–that the plaintiff's position had been eliminated–was false and therefore pretextual because the plaintiff had actually been replaced. In the first case, *Janiuk v. TCG/Trump Co.,* 157 F.3d 504 (7th Cir. 1998), the plaintiff pointed to a corporate organizational chart produced only days after his termination, which listed another employee named Kalk as the division sales manager, which was the plaintiff's former position. (The preceding organizational chart had listed the plaintiff as the division sales manager, and Kalk occupied a lower position called

area manager.) The defendant argued that the organizational chart was a mistake, and that executives had ordered a member of the marketing department to correct the chart shortly after the mistake was noticed. However, the member of the marketing department attested that she was never ordered to do so and that the error was never brought to her attention. No corrected chart was ever provided to the court. *Id.* at 506-07.

The Seventh Circuit held that a jury could conclude that the chart was accurate and that, as the chart indicated, Kalk had replaced the plaintiff after the plaintiff's termination. The court further held that a jury could then conclude that the defendant lied in asserting that it eliminated the plaintiff's position as part of an RIF; this established pretext for purposes of surviving the defendant's motion for summary judgment. The defendant protested that its RIF was real, and not a sham, and that this showed that it honestly believed in its stated reason for the plaintiff's termination. But the Seventh Circuit held that evidence showing that a RIF truly occurred, such as evidence of the company's financial distress and reorganization, did not go to the real issue in the case: whether the defendant made decisions in connection with the RIF that violated the ADEA. *Id.* at 509 n.5.

The Seventh Circuit came to the opposite conclusion on the issue of pretext in *Krchnavy v. Limagrain Genetics Corporation,* 294 F.3d 871 (7th Cir. 2002). In *Krchnavy*, the defendant terminated the plaintiff, an administrative assistant, following a corporate merger and reorganization, claiming that it needed to consolidate certain customer

service functions, in part by eliminating the plaintiff's position and distributing her duties to other employees. The plaintiff pointed out that when she was terminated, she was told that the company was also eliminating the position belonging to another employee named Cobain, but she was not informed that Cobain was actually going to remain employed with the company performing some of the plaintiff's former job duties. Cobain himself had also informed the plaintiff that he had been offered a new job doing the same type of work he had previously done as a sales assistant, along with taking over some of her former responsibilities. Further, the plaintiff asserted that her husband saw Cobain using her old office, that another co-worker told her husband that Cobain was "taking over" her former job, and that the defendant's human resources manager had responded to the EEOC's inquiries with letters containing factual inaccuracies regarding the scope of Cobain's duties before and after the reorganization.

The Seventh Circuit held that *Januik* presented a "much stronger case of pretext" than *Krchnavy*. *Id.* at 878. The court reasoned that Krchnavy's former position of "Sales/Administrative Assistant - Office Manager" was similar to Cobian's new title, "Sales and Administrative Assistant - Warehouse and Shipment Coordinator," but that the similarity only suggested that Cobain had absorbed some of the plaintiff's duties, not that he had replaced her. The court emphasized that while some of the plaintiff's former duties were assigned to Cobain, some were also assigned to other employees. The court also focused on the fact that Cobain performed some duties, such as overseeing a mini-warehouse, that the plaintiff had never done.

The question for this court is whether the case at hand is more like *Januik,* where pretext was sufficiently established, or more like *Krchnavy,* where it was not. Plaintiff points to Flahive's email, circulated to the Client Markets division, which welcomed Majewski to her new position and listed five bullet-pointed duties, all of which plaintiff claims were assigned to him previously. Plaintiff also points to Majewski's December 2006 self-assessment, in which four out of nine total goals listed by Majewski appeared "nearly word for word" like plaintiff's goals of May 2006. Plaintiff attests that Majewski's December 2006 goals comprised 80% of his former job responsibilities.

Plaintiff further asserts that Trauner, one of the employees that plaintiff supervised for four years, was of the opinion that Majewski had replaced plaintiff, and that another employee contacted plaintiff after reading Flahive's email introducing Majewski and said, "I thought they eliminated your job." Additionally, Majewski testified that, when she was discussing her new role with Flahive, she asked him "if it was Jim Weide's role. Because some of it sounded familiar. And his answer was no." Plaintiff further suggests that defendant earmarked Majewski for her new position in the same month that he was fired, pointing to the fact that defendant created computer files containing job descriptions during that time and the names of the files contained Majewski's name. Plaintiff's and Majewski's titles were also somewhat similar, though not identical; plaintiff's title when he was terminated was "Second Vice President, Marketing Research" and Majewski's new title, after plaintiff's termination, was "Vice President - Marketing and Sales."

Up until this point, the case at hand leans towards the *Krchnavy* end of the pretext spectrum. Like the plaintiff in *Krchnavy,* plaintiff has pointed to a series of circumstances and events that, at best, suggest that Majewski assumed the majority of plaintiff's duties, but some of plaintiff's duties were absorbed by other employees and Majewski performed duties in her new role that plaintiff never did. Plaintiff, like the plaintiff in *Krchnavy,* also points out that other employees questioned whether plaintiff had actually been replaced. The sum of plaintiff's evidence regarding the shifting of duties and anecdotes regarding other employees' opinions simply do not create an inference of pretext, and if the court were to stop here, plaintiff's pretext argument would likely fail.

However, plaintiff has pointed to an additional piece of evidence that pushes this case across the line drawn by *Krchnavy*. Specifically, plaintiff points to a note written by Juechter during Juechter's conversation with Flahive about plaintiff's termination, in which Juechter wrote: "Heather Majewski ~~will~~ may replace." The court concedes that plaintiff's evidence of pretext is not as strong as the organizational chart in *Januik,* which showed another employee occupying precisely the same position as the terminated employee. But Juechter's note–combined with the other evidence summarized above–pushes this case closer to *Januik* than to *Krchnavy*. The fact that Juechter crossed out "will" and wrote "may" gives the court pause but does not change its decision; even if Juechter never meant "will" and always meant "may," a reasonable jury could conclude that Juechter's note is indicative of defendant's intent to replace

plaintiff with someone–not to eliminate plaintiff's position–and that Majewski was a leading candidate. In other words, a reasonable jury could read Juechter's note as indicating that plaintiff will definitely be replaced and that Majewski *may* be that replacement.

Defendant has asserted that Juechter's note could mean that Majewski was replacing plaintiff in the overall department *headcount*. This is indeed a possible interpretation. But, as mentioned, there is another reasonable interpretation that supports a showing of pretext. A reasonable jury could find–based on all of the evidence presented, including Juechter's note–that defendant did in fact replace plaintiff and, therefore, that defendant's stated reason for terminating plaintiff was pretextual. In sum, though plaintiff has perhaps done so weakly, he has met his burden in response to defendant's motion for summary judgment by pointing to sufficient evidence of pretext.[3]

---

[3] Plaintiff's evidence does not prove, directly, that defendant discriminated against him on the basis of age. But the present analysis involves the indirect method. "The theory behind the indirect method of proof is that evidence of discrimination, including even circumstantial evidence, may be extremely difficult for a plaintiff to discover. Therefore, if the plaintiff proves that the employer's proffered explanation is pretextual, the jury may infer discrimination from that proof alone." *Perfetti v. First Nat. Bank of Chi.*, 950 F.2d 449, 451 (7th Cir. 1991). Because plaintiff is able to survive summary judgment on his ADEA claim via the indirect method of proof, the court need not analyze the parties' arguments regarding the direct method of proof. The court does note, however, that plaintiff's best evidence of discrimination on the basis of age in support of his direct method argument is that Flahive, in his email introducing Majewski to the Client Markets division, used the phrases "new perspectives" and "energetic and outgoing personality," which plaintiff claims are "words often associated with youth." (Pl.'s Resp. 17.) If the court had gone on to evaluate the merits of this direct method argument, it would not have passed muster.

**V.    CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment as to plaintiff's ADEA claim is denied. Plaintiff has conceded that he is unable to refute defendant's motion for summary judgment on his ERISA claim; therefore, defendant's motion for summary judgment is granted as to plaintiff's ERISA claim. In sum, defendant's motion for summary judgment (DE # 29) is **GRANTED** in part, and **DENIED** in part. The court withholds ruling on defendant's request for attorneys' fees in relation to plaintiff's ERISA claim and will order further briefing on the issue as deemed necessary.

**SO ORDERED.**

Date: September 30, 2010

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT